The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner George T. Glenn, II, and the briefs and arguments on appeal. Based upon the assignments of error, the appealing party has not shown good ground to receive further evidence. However, upon reconsideration of the evidence, the Full Commission affirms in part and modifies in part the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
***********
The Full Commission finds as facts and concludes as matters of law the following:
 STIPULATIONS
1. All the parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employer-employee relationship existed between defendant-employer and plaintiff-employee at all relevant times herein.
3. Defendant-employer was an approved self-insured at all relevant times herein, with Riscorp acting as its administrator.
4. On 6 April 1995, the Industrial Commission approved the parties 21 June 1994, Form 21 Agreement for Compensation for Disability, wherein they stipulated that on 11 May 1994, plaintiff sustained a compensable back injury which became disabling on 16 May 1994.
5. On 20 June 1995, the Commission approved the parties 21 June 1994, "Supplemental Memorandum of Agreement as to Payment of Compensation wherein the parties further stipulated that beginning 13 June 1994, plaintiff again became totally disabled and that defendants would pay plaintiff total disability compensation benefits at $146. 88 per week for necessary weeks.
6. Plaintiff was last paid disability compensation benefits by defendants or its adjusting agent or carrier on 25 April 1996.
7. At all relevant times herein, defendant-employers adjusting agent or insurance carrier for workers compensation purposes was Riscorp, Inc. which has become part of Zenith Insurance Company.
8. The issues to be determined are as follows:
a) Did plaintiffs failure to file a hearing request within 2 years from 25 April 1996 bar him from receiving additional compensation?
b) Has defendant met its burden of showing that plaintiffs total disability ended on or about 25 April 1996 when plaintiff returned to work?
c) Is plaintiff entitled to additional total disability compensation benefits for the period 18 July 1994 through 9 October 1994, and from 26 April 1996 and continuing?
d) What is plaintiffs average weekly wage pursuant to G.S. 97-2(5)?
e) Should plaintiffs motion for approval of Dr. Campbell to assume his medical care be granted?
f) Should plaintiffs 18 December 1998 Motion to Strike the deposition testimony of Dr. Pikula be granted under the holdings in Crist v. Moffatt, 326 N.C. 326, 389 S.E.2d 41 (1990) and Salaamv. N.C. Dept. of Transportation, 122 N.C. App. 83, 472 S.E.2d 20
(1996) pet. disc. rev. denied. 345 N.C. 494, 480 S.E.2d 51 (1997)?
9. On 6 January 1999, the parties stipulated to additional wage information.
10. The following documents were stipulated into evidence:
a."Industrial Commission Proceedings Leading to Hearing consisting of 22 pages.
b. Plaintiffs medical records consisting of 122 pages with an index.
All exhibits attached to the Pre-Trial Agreement as stipulated exhibits have now been included in the transcript.
***********
Based upon the competent evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. As of the date of the hearing before the Deputy Commissioner on 30 September 1998, plaintiff was a 35-year old married man living with his wife and their 9-year old son. He graduated from high school in 1981. From 1979 through 1993, plaintiff was continuously employed or self-employed in unskilled heavy physical exertion jobs, mainly in the construction industry. Plaintiff had no history of any back problem or other health problem which interfered with his ability to earn wages in employment prior to the events of 11 May 1994.
2. On 19 December 1993 plaintiff began working for defendant-employer as a laborer at defendants Elkin, N.C. plant at $5. 50 per hour. Plaintiffs normal and usual duties at defendant-employer required that he perform almost constant repetitive motions with his hands, lift a minimum of 25-30 pounds, and stand and/or walk for about 10 hours a day, four to five days a week, with frequent stooping and reaching as well as occasional climbing and kneeling.
3. On 11 May 1994 a co-employee, Loren Asbury, accidentally pulled a rack or pallet of glass weighing about 3000 pounds on the top of his foot. Plaintiff and co-employee Rick Nolan tried to free Mr. Asburys foot by pushing the rack of glass off it, but they were unable to do so.
4. In this emergency situation, plaintiff bent over to the floor and, alone, lifted the 3000 pound pallet off of Mr. Asburys foot enough to allow the Mr. Asbury to free his foot. In so lifting the pallet of glass, plaintiff sustained a ruptured disc at the L5-S1 level of his spine.
5. Plaintiff tried to continue working but became totally disabled from work starting 16 May 1994 due to severe lower back pain and right leg pain resulting from his accident. Defendants admitted the liability for plaintiffs injury through an Industrial Commission Form 21 Agreement for Compensation for Disability; however, defendants did not pay plaintiff during the seven (7) day waiting period. The parties tentatively agreed that plaintiffs average weekly wage at the time of his back injury was $220.31, but this figure was "subject to wage verification.
6. Because of the shortness of time during which plaintiff worked for defendant-employer, results fair and just to both parties would not be served by dividing plaintiffs earnings by the number of weeks he worked. Rather, the earnings of Maylan Brewer, another employee of the same grade and character, employed in the same class of employment at the same location as plaintiff for the 52-week period prior to 11 May 1994, should be used to determine plaintiffs average weekly wage. Using this method of calculation, plaintiffs average weekly wage as of 11 May 1994 was $255. 17 per week.
7. In the period 16 May 1994 through 18 July 1995 plaintiff made at least five different return to work efforts at defendant-employer at various "light duty jobs created or modified to accommodate plaintiffs medical work limitations. In each instance the job duties were not suitable to plaintiffs work capacities because plaintiff was unable to sit or stand for sustained work periods of more than a few days duration, due to an increase in his lower back pain and due to his right leg pain and weakness, all of which could only be relieved by frequent periods of complete recumbency.
8. On 16 May 1994 defendants referred plaintiff to E. Wilson Griffin, M.D. for treatment. Plaintiff was taken out of work initially from May 24th to May 29th and again beginning on 13 June 1994 due to increased back pain. Dr. Griffin prescribed a lumbar CT scan which was performed on 21 June 1994 and which revealed that plaintiff had a centrally located ruptured disc at the L5-S1 level of his spine.
9. In July 1994, plaintiff sustained a heart attack while out of work due to his back injury. Dr. Griffin, in a telephone conversation with Debbie Stamie from Comp. Source on 29 August 1994, speculated that plaintiff would have been able to return to light duty work by late July 1994 had it not been for his heart attack. No weight is given to Dr. Griffins speculations in this regard. Defendants scheduled an evaluation for plaintiff with Dr. C.S. Whitman, an orthopedic surgeon, on 16 September 1994 to determine when plaintiff "might be orthopaedically ready to return to work. On 6 October 1994 Dr. Whitman noted that plaintiff could return to light duty "if he were not a cardiac patient.; however, Dr. Whitman released plaintiff to return to limited duty work on 13 October 1994 with restrictions. Plaintiff returned to work as directed and because of increased back pain, Dr. Whitman took him out of work again on 24 October 1994. Plaintiffs disability from 21 June 1994 to 13 October 1994 when he returned to work on a trial basis, was due to his back injury and his heart condition (after July 1994).
10. After his initial evaluation of plaintiff in September 1994, defendants arranged for Dr. Whitman to assume plaintiffs medical care. Dr. Whitman served as the primary treating physician for plaintiffs back injury during the period from 16 September 1994 through 15 November 1995.
11. Dr. Whitman prescribed, and plaintiff participated in, physical therapy treatments at Hugh Chatham Memorial Hospital in Elkin, N.C. in the period from December 1994 into April 1995. Unfortunately, these treatments resulted in little improvement in plaintiffs condition. By May 1995, plaintiffs sitting tolerance was about 30 minutes at a time, his standing tolerance was about 30 minutes at a time, and his walking tolerance was up to about 15 minutes at a time, all limited due to severe lower back and right leg pain.
12. In May and June 1995 Dr. Whitman prescribed, and plaintiff participated in, a 30-day work hardening program at Rehability in Elkin, N.C. for about 3 to 4 hours a day following 3 to 4 hours of "light duty work activities for defendant-employer. Plaintiff was unable to return to a regular work schedule of eight hours a day, 5 days a week.
13. On 13 July 1995 defendants had plaintiff evaluated by a Charlotte neurosurgeon, Dr. Raymond Sweet. Dr. Sweet felt plaintiff suffered from right sacroilitis and that surgery would not help improve plaintiffs condition.
14. On 14 July 1995 Dr. Whitman prescribed medical work limitations of limited squatting, bending and climbing; no lifting over 10 pounds; no sitting or standing more than one hour; and alternating positions.
15. On 18 July 1995 plaintiff returned to "light duty work for defendant-employer within the above medical limitations. By 21 July 1995 plaintiff was unable to continue working at all because the prolonged standing or sitting over an eight hour work day caused an increase in his lower back pain and right leg pain. Dr. Whitman prescribed rest for plaintiffs pain.
16. On 12 October 1995 Dr. Whitman prescribed a myelogram/CT scan which revealed plaintiff suffered from a ventral and right lateral ruptured disc at L5-S1 and from impingement of the right nerve root at the L5-S1 level, which findings were consistent with plaintiffs pain complaints.
17. On 15 November 1995 Dr. Whitman opined that plaintiff was at maximum medical improvement with conservative care. He suggested that plaintiff consider having miscrodiskectomy surgery on his ruptured disc. Dr. Whitman encouraged plaintiff to secure another medical opinion concerning back surgery. This was the last time Dr. Whitman saw plaintiff.
18. In December 1995 the defendants adjusting agent or carrier informed plaintiff that it would pay for another medical opinion concerning surgery, but only if plaintiff went to see one of two physicians chosen by defendants, both neurosurgeons in Winston-Salem, N.C. Consequently, plaintiff saw Dr. Louis Pikula for another opinion concerning whether surgery would likely make him better. Nurse Patricia Wyatt, the rehabilitation professional hired by defendants, made the arrangements.
19. On 18 January 1996 Dr. Pikula evaluated plaintiff and later reviewed the radiological studies of plaintiffs lumbar spine.
20. On 8 February 1996 Dr. Pikula talked with Nurse Wyatt by telephone. He told Nurse Wyatt that he did not recommend surgery because it would not benefit plaintiff. Unaware of plaintiffs extensive prior physical therapy and treatment history, Dr. Pikula told Nurse Wyatt that physical therapy might help.
21. In February 1996 defendants unilaterally substituted Dr. Pikula to replace Dr. Whitman as plaintiffs primary treating physician for plaintiffs back injury. Defendants had Nurse Wyatt set up another appointment for plaintiff with Dr. Pikula for 4 March 1996.
22. On 4 March 1996 Dr. Pikula met with plaintiff and told him that he did not recommend back surgery but did recommend modified work hardening and water therapy for 2 weeks.
23. Defendant-carrier had Nurse Wyatt instead arrange for plaintiff to travel to Charlotte, N.C., where he was to participate in a four-week out-patient rehabilitation program at The Rehab Center during the period 18 March 1996 through 17 April 1996. Defendant-carrier chose The Rehab Center to treat plaintiff, and plaintiff participated in the program.
24. The Rehab Centers program did help improve plaintiffs strength, flexibility, and mobility and did help alleviate his depression some. The program did not improve plaintiffs endurance. Plaintiff remained unable to sit, stand or walk, or to perform any combination thereof, for longer than a total of about 3 to 4 hours. After 3 to 4 hours plaintiff had to lie down and rest for an hour or more to help lessen his increased back and leg pain. The Rehab Centers treatment did not improve plaintiffs disabling back and right leg pain condition from his ruptured disc.
25. The defendants arranged for plaintiff to return to Dr. Pikula on 22 April 1996. Dr. Pikula agreed for plaintiff to again return to work to try a light duty job where plaintiff could sit or stand at his option, with little lifting.
26. On 25 April 1996 plaintiff made his sixth return to work effort at defendant-employer with the job "chop saw off-bear operator, which involved mostly standing. According to defendant-employers own records, defendants refused plaintiff a chair, and plaintiff worked an 8-hour shift beginning at 3:30 p.m. Plaintiff took a 10-minute break at 5:30 p.m., 30-minute break at 6:45 p.m., a 15-minute break at 9:30 p.m. and a 25-minute break at 10:20 p.m., all as authorized by his employer.
27. On 25 April 1996 defendants stopped paying plaintiff temporary total disability compensation benefits.
28. On 26 April 1996 at about 2:30 p.m. plaintiff by telephone informed defendant-employer that he would not be able to report to work that day due to severe pain in his back. Plaintiffs 25 April 1996 return to work effort where he had to stand and/or sit for about eight hours without being able to lie down or rest caused his back pain to again become severe and disabling by 26 April 1996 and plaintiff was unable to return to work. By 26 April 1996, plaintiffs 25 April 1996 return to work effort at defendant-employer was unsuccessful. On 30 April 1996, defendant-carrier submitted to the Industrial Commission a "Notice of Termination of Compensation By Reason of Trial Return to Work Pursuant to N.C. Gen. Stat. 97-18(b) and 97-32. 1 (Form 28T). The Form 28T noted that plaintiff could request that his compensation be reinstated by submitting the attached "Form 28E. The Industrial Commission has no "Form 28E. Defendants were aware, or reasonably should have been aware that plaintiffs Trial Return to Work was unsuccessful at the time the Form 28T was submitted to the Industrial Commission.
29. Defendants arranged for plaintiff to return to see Dr. Pikula on 1 May 1996. Unbeknownst to plaintiff until Dr. Pikulas 5 November 1998 deposition testimony, the defendants or their agents had nonconsensual ex parte contact with plaintiffs then treating physician Dr. Pikula prior to plaintiffs 1 May 1996 visit. Dr. Pikula testified concerning plaintiffs 25 April 1996 return to work effort as follows: "I have a note that he (plaintiff) was taking 30 minutes every hour of break, that he couldnt do the work because of pain. This "note to which Dr. Pikula referred contained false information about plaintiffs work breaks during plaintiffs return to work effort, and prejudiced Dr. Pikula against plaintiff.
30. During his 1 May 1996 visit, plaintiff told Dr. Pikula that he worked an eight-hour shift and took few work breaks, but was unable to work more than the one shift due to increased back and right leg pain which was not relieved with prescribed medication. Dr. Pikula informed plaintiff that he had no further treatment to offer him which might make him better, and that plaintiff was released from his care. Due to the contents of the false note supplied to Dr. Pikula, Dr. Pikula did not believe what plaintiff told him about the increased pain in his back or in his right leg or about his inability to continue his trial returns to work effort due to increased back and leg pain.
31. On 1 May 1996, Dr. Pikula spoke with Nurse Wyatt. Dr. Pikula indicated that "we [Dr. Pikula and Nurse Wyatt] discussed [plaintiffs] case. Dr. Pikula told Nurse Wyatt that his permanent impairment rating for plaintiff would depend on plaintiffs pain level and movement, but would be about 5 or 10 percent.
32. On 2 May 1996 plaintiff made his seventh return to work effort at defendant-employers place of business at various light duty jobs. Each job involved mostly standing or a sit-stand option, and each lasted eight hours per night, five nights a week. Defendants did not file a trial return to work notice (Form 28T) with the Industrial Commission even though they were aware that plaintiffs 25 April 1996 trial return to work was unsuccessful and that plaintiffs return to work on 2 May 1996 was a new trial return to work. Defendants also did not reinstate plaintiffs compensation during the period from 26 April 1996 to 2 May 1996 when plaintiff was unable to work.
33. By 13 May 1996, plaintiff again became unable to continue working at any light duty job with defendant-employer or at any other job due to severe lower back and right leg pain which could only be improved by frequent periods of lying down. By 13 May 1996 plaintiffs return to work effort which began on 2 May 1996 had become unsuccessful. The jobs plaintiff performed were not suitable to his capacity. Moreover, defendants introduced no evidence to show that the jobs as modified for plaintiff were available in the competitive market, and that plaintiff could get one if he tried.
34. On 13 May 1996 Dr. Pikula wrote Nurse Wyatt that he felt plaintiff had a seven percent (7%) permanent partial disability rating to his back. Dr. Pikula, plaintiffs treating physician chosen by defendants, found plaintiff to be at maximum medical improvement by 1 May 1996 when he released him from his care. After 1 May 1996, plaintiff had no treating physician authorized by defendants and was forced to seek medical treatment on his own.
35. On 13 May 1996, plaintiff saw his family physician, Dr. Christopher Campbell, for treatment of back and bilateral leg pain, right worse than left. Plaintiff told Dr. Campbell that he attempted the light duty jobs at defendant-employers facility but that he was unable to continue working because the prolonged standing caused him to have severe lower back pain. Dr. Campbell diagnosed acute exacerbation of chronic back pain and opined that plaintiff was unable to continue working for defendant-employer or in any other employment due to his back condition. Dr. Campbell prepared an out of work note which he gave to plaintiff, who in turn on 13 May 1996 gave the note to defendant-employer.
36. On 13 May 1996 defendant-employer contacted its workers compensation adjusting agent or carrier concerning whether the employer had to honor Dr. Campbells out-of-work note. The adjusting agent or carrier informed defendant-employer that theemployer had to honor the out-of-work note, but the carrier did not. The carrier decided that it did not have to reinstate payment of total disability workers compensation benefits to plaintiff because Dr. Campbell was not "authorized or "approved by the adjusting agent or carrier to treat plaintiff. However, at that time, the carrier was aware that plaintiff was not under the care of any physician that they had authorized, that plaintiff still needed medical care for his admittedly compensable injury and that they were obligated to provide medical treatment to plaintiff. Defendants did not reinstate compensation to plaintiff after his 2 May 1996 trial return to work became unsuccessful. Defendants have refused to pay compensation to plaintiff after 25 April 1996.
37. On 6 June 1996 Greensboro neurosurgeon Dr. Stephen Robinson evaluated plaintiff on referral by Dr. Campbell. Dr. Robinson opined that surgery was not presently recommended unless a new lumbar MRI revealed a worsened condition. Dr. Robinson also opined that plaintiff was unable to return to any type of work in an industrial setting. He referred plaintiff back to Dr. Campbell for ongoing conservative treatment, but recommended the MRI. Defendant-employer did not approve the MRI.
38. On 14 June 1996 defendant-employer received a note from Dr. Campbell stating that in his opinion plaintiff was unable to return to work at any job at defendant-employer due to chronic back pain.
39. On 1 November 1996 while still refusing to reinstate plaintiffs temporary total disability benefits, defendants wrote Dr. Campbellex parte, notifying him that defendant-employer had three temporary special assignment positions available for plaintiff.
40.On 15 November 1996 Dr. Campbell reviewed the three written job descriptions prepared by the employer and authorized plaintiff to try any of these jobs.
41. On 13 December 1996 defendants wrote plaintiff that it had three jobs for him to attempt at its manufacturing plant in Wilkesboro and that Dr. Campbell had approved his trying these jobs.
42. On 17 December 1996 plaintiff made his eighth trial return to work effort at defendant-employer as an "end cap installer. This job involved sitting or standing, with little bending and little lifting. Plaintiff performed this job for 8 hours on 17 December and 18 December 1996. By 19 December 1996, plaintiff notified defendant-employer that he was unable to continue performing this job due to increased lower back and leg pain.
43. Plaintiffs 17 December 1996 trial return to work effort became unsuccessful by 19 December 1996 due to his increased lower back and right leg pain resulting from the prolonged sitting and/or standing required in order to perform the job.
44. On 20 December 1996 defendants wrote plaintiff requiring that he secure a written statement from his doctor verifying his inability to work; however, defendants did not file a From 28T notice with the Industrial Commission to advise that plaintiff had made another trial return to work effort. On 24 December 1996 defendant-employer wrote plaintiff that company policy considered any absence of more than 3 days without proper medical verification to be job abandonment and voluntary resignation.
45. Plaintiff was finally able to get in to see Dr. Campbell on 31 December 1996. Dr. Campbell examined plaintiff and again found that plaintiffs chronic back condition was worse due to his return to work effort at defendant-employer. Dr. Campbell wrote an out-of-work note stating that in his opinion plaintiff was not capable of performing even the light duty job made available to him by defendants. A copy of this note was telefaxed to the defendant-employers adjusting agent or carrier on 31 December 1996, and given to defendant-employer on 3 January 1997. The Full Commission finds that plaintiffs chronic back condition prevented him from working at the jobs provided by defendant-employer on his eighth trial return to work effort and that by 19 December 1996 plaintiff was totally incapable of performing the work offered by defendant-employer. Again, defendants did not reinstate compensation to plaintiff.
46. At the 30 September 1998 hearing plaintiff testified that he continued to be limited to periods of about 2 to 4 hours of alternate sitting, standing and walking, followed by a period of about an hour or two where he had to lie down and rest in order to get some relief from his constant lower back pain which was increased by any prolonged period of sitting, standing and walking longer than up to about 3 hours. The Full Commission finds plaintiffs testimony to be credible regarding the nature and extent of his lower back and right leg pain and weakness and that he is required to have frequent periods of complete rest by lying down in order to control the level of his pain.
47. In the period since 16 May 1994 plaintiff has made at least eight different good faith, trial return to work efforts at very light duty jobs made available to him by defendant-employer. In each instance the job was not suitable to plaintiffs capacities and his effort was unsuccessful due to increased lower back pain and increased right leg pain and weakness from the prolonged sitting or standing required by the job. These light duty jobs were also modified to fit plaintiffs restrictions as to not be available in the competitive job market. Plaintiff is unable to sit, stand or walk for longer than about 3 hours at a time on a sustained work basis of 5 days a week. He requires frequent periods of complete recumbency to help keep his pain level from becoming severe.
48. The various employment opportunities offered to plaintiff by defendant-employer in the period after his 11 May 1994 back injury were not suitable to plaintiffs capacities and plaintiffs refusal to accept or continue performing any of these positions was justified.
49. On 1 May 1996 plaintiff reached maximum medical improvement from his 11 May 1994 lower back injury which is the subject of this claim.
50. As the result of his 11 May 1994 injury by accident, plaintiff has been incapable of earning wages in any position with defendant-employer or in any other employment from 16 May 1996 through the present and continuing, except for the periods in which plaintiff attempted to return to work from 16 May 1994 through December 1996. Plaintiff reached maximum medical improvement on 1 May 1996, and since that time has been totally incapable of earning wages in any suitable employment. Defendants have not rebutted plaintiffs presumption of continued disability.
51. The Full Commission affirms Deputy Commissioner Glenns approval of plaintiffs motion to have Dr. Christopher Campbell assume plaintiffs medical care for his back condition effective 13 May 1996. Defendants are not obligated to pay for medical care provided by Dr. Campbell for plaintiffs unrelated medical conditions; however, defendants are obligated to pay for medical care provided by other doctors for plaintiffs compensable injury upon referral from Dr. Campbell.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiffs average weekly wage as of 11 May 1994 was $255. 17 which yields a compensation rate of $170.12. G.S. 97-2(5).
2. On 11 May 1994 plaintiff sustained an injury by accident arising out of and in the course of his employment by defendant-employer, to wit, a ruptured disc at the L5-S1 level of his spine which impinges on his L5 nerve root leading to his right leg. G.S.97-2(6). Disability resulting from said injury began on 16 May 1994. Plaintiff has remained totally disabled from suitable employment since 11 May 1994. The wages earned by plaintiff in the modified jobs during his numerous trial returns to work were not indicative of his wage earning capacity. Consequently, defendants have not rebutted the presumption of total disability.
3. As a result of his 11 May 1994 injury by accident, plaintiff is entitled to be paid by defendants ongoing total disability compensation benefits at the rate of $170.12 per week for the period from 16 May 1994 through the present and continuing until he returns to work or until further order of Industrial Commission. Defendants are entitled to a credit for wages earned for the periods in which plaintiff attempted to return to work from 16 May 1994 to December 1996, and for compensation paid to plaintiff pursuant to the approved Form 21 and Form 26 Agreements. G.S. 97-29 and 97-42.
4. Under the Act, plaintiff is entitled to select the more favorable remedy, which under the facts of this case would be to receive ongoing benefits pursuant to G.S. 97-29, rather than benefits for his 7% rating pursuant to G.S. 97-31. Gupton v.Builders Transport, 320 N.C. 38, 357 S.E.2d 674 (1987).
5. As a result of his 11 May 1994 injury by accident, plaintiff is entitled to have defendants pay for all reasonably required medical expenses incurred or to be incurred in the future by plaintiff which are designed to effect a cure, provide relief or lesson his disability. G.S. 97-2(19); G.S. 97-25.
6. Effective 13 May 1996 the Industrial Commission approves Dr. Christopher Campbell as plaintiffs primary treating physician for his back condition. G.S. 97-25.
7. Plaintiff was not and is not capable of performing any of the light duty jobs that were offered to him by defendant-employer. Both plaintiff and Dr. Campbell notified defendant-employer by 13 May 1996 that plaintiff was unable to perform the jobs he attempted on 25 April 1996 and 2 May 1996. Defendants failure to resume paying plaintiff total disability benefits under G.S. 97-29
between 26 April 1996 and 2 May 1996 may be excused on grounds that plaintiff arguably violated the provisions of G.S. 97-32. 1, I.C. Rule 404A, which require plaintiff to secure verification from his authorized treating physician that he is unable to work, and plaintiff did not follow the verification procedures provided by Rule 404A. However, when plaintiff returned to work on 2 May 1996, this became a new trial return to work period and any failure to follow I.C. Rule 404A ended. Defendants were obligated to file a new trial return to work notice with the Industrial Commission to indicate that plaintiff was attempting another trial return to work. Defendants did not file such a form and plaintiffs note to defendants from Dr. Campbell was sufficient to obligate defendants to reinstate compensation. Defendants failure to reinstate compensation after 13 May 1996 entitles plaintiff to a 10% penalty on all compensation due thereafter until his next trial return to work effort on 17 December 1996. Defendants were obligated to reinstate total disability compensation to plaintiff after his eighth trial return to work effort was unsuccessful on 19 December 1996. Plaintiff is entitled to a 10% penalty on all compensation due after 19 December 1996 for defendants failure to reinstate compensation.
8. Defendants nonconsensual ex parte contact in late April 1996 with plaintiffs treating physician Dr. Pikula violated the principles, and the prophylactic protection against such communications, first announced by our Court in Crist v. Moffatt,326 N.C. 326, 389 S.E.2d 41 (1990) and specifically made applicable to Industrial Commission proceedings on March 19, 1996 in Salaam v. N.C. Dept. Of Transportation, 122 N.C. App. 83,472 S.E.2d 20 (1996), disc. rev. denied, 345 N.C. 494, 480 S.E.2d 51
(1997). Moreover, regardless of those cases, the intentional contact by defendants caused false, misleading and prejudicial information to be improperly communicated to Dr. Pikula, who was thereby influenced against his patient. Defendants knowingly so influenced Dr. Pikula. The remedy for the violation, and/or the misconduct, is to strike the tainted testimony. Therefore, Dr. Pikulas testimony and medical notes on plaintiffs capacity to work or to perform jobs offered by defendant-employer on or after 1 May 1996 are stricken.
9. Plaintiffs delay in seeking a hearing regarding defendants unilateral decision to terminate benefits is not a bar to plaintiffs claim for continuing disability compensation as the Commission already had jurisdiction over the claim. No Form 28B was filed reporting to the Industrial Commission or to plaintiff that he had been paid all compensation due more than 2 years prior to hearing and plaintiff has not been paid for his permanent injuries. Thus, this case remained in "pending or interlocutory status. G.S. 97-24.
************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission modifies and affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay plaintiff ongoing total disability benefits at the rate of $170.12 per week for the period of 16 May 1994 through 30 September 1998 and continuing until such time as he returns to work or until further order of the Industrial Commission. Defendants are allowed a credit for compensation previously paid pursuant to the Form 21 and 26 agreements, for the periods during which plaintiff attempted to return to work during his healing period after 16 May 1994. From the amounts having accrued, this compensation shall be paid to plaintiff in a lump sum. This compensation is subject to the attorneys fee approved herein.
2. Defendants shall pay a 10% penalty on all unpaid compensation due plaintiff from 13 May 1996 to 17 December 1996 and after 19 December 1996.
3. Defendants shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of the compensable injury. Defendants shall pay for the treatment provided by Dr. Campbell and all doctors to whom plaintiff was referred by Dr. Campbell for plaintiffs back injury. Defendants shall also pay for another lumbar spine MRI scan made on a fixed base unit as first requested by Dr. Robinson on 6 June 1996.
4. A reasonable attorneys fee in the amount of thirty-three and one-third percent (33-1/3%) of the accrued compensation awarded herein to plaintiff is approved for counsel for plaintiff. This fee shall be deducted from the accrued amounts owed to plaintiff and shall be paid directly to counsel for plaintiff. A reasonable attorneys fee of twenty-five percent (25%) of the ongoing future compensation due plaintiff is approved for counsel for plaintiff, resulting in counsel for plaintiff receiving every fourth of the ongoing checks payable to plaintiff.
5. Defendants shall pay the costs due this Commission.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_______________ LAURA K. MAVRETIC COMMISSIONER
S/_____________ THOMAS J. BOLCH COMMISSIONER
BSB:md